UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Criminal Case No. 2:20-cr-00777-001 |
| | § | |
| CIRO CASTILLO-SANTANA | § | |

## MEMORANDUM OPINION AND ORDER ON MOTION FOR NEW TRIAL

Defendant Ciro Castillo-Santana moves for a new trial following his conviction for knowingly transporting illegal aliens. (Dkt. No. 92). He alleges the Government violated his constitutional right to remain silent when during its closing argument, the prosecutor commented upon the Defendant's pre-*Miranda* silence. He also alleges this comment was prejudicial. Based on the following, and after carefully considering the Motion, the Government's Response, (Dkt. No. 93), the entire record and the applicable law, the Court **DENIES** the Defendant's Motion.

### I. BACKGROUND

A court weighing the import of a prosecutor's comment must consider that comment "against the record as a whole." *See United States v. Wall*, 389 F.3d 457, 466, 474–75 (5th Cir. 2004) (internal quotation omitted). This Court has carefully reviewed the entire record but finds it necessary to recount only the evidence presented at trial concerning the Defendant's pre-*Miranda* silence and the Parties' closing arguments.

#### A. KEY EVIDENCE AT TRIAL

The most important evidence presented at trial pertaining to the Defendant's pre-*Miranda* silence was the narrative of the Defendant's arrest as told through the Government's case-in-chief and the Defendant's own testimony.

1. **The Government's Narrative of the Defendant's Arrest**

The Government offered testimony from several Border Patrol agents and select video footage to narrate the events of the Defendant's arrest. *See generally* (Dkt. No. 97); (Gov. Ex. 3). At half past midnight on March 15, 2020, the Defendant drove an SUV containing three passengers to a Border Patrol immigration checkpoint in Falfurrias, Texas. (Dkt. No. 97 at 155, 159–60, 164). Although manning a passenger-style SUV, the Defendant pulled into a lane designated for commercial vehicles. (*Id.* at 160). As he slowed at the primary inspection point, a K-9 assistant alerted to the presence of narcotics or additional people.[1] (*Id.* at 227–29). Two Border Patrol agents approached. (*Id.* at 161). The car's radio was "blaring," so the agents asked the Defendant to turn it down. (*Id.* at 161, 188). The Defendant complied and leaned back in his seat, "took a drag of his cigarette," "blew it out towards [the agents]," and said, "Que?" (*Id.* at 230). An agent asked, "Where are you from?" (*Id.*). The Defendant responded, "We're all Cuban." (*Id.*). The Defendant was "quick to answer for all of them." (*Id.* at 164). He also appeared "nervous," "very agitated," and "very much so in a hurry to get away from [the agents]." (*Id.* at 170).

When asked where he and the passengers were "*coming* from," the Defendant pointed over his shoulder and said, "[o]ver there." (*Id.* at 162) (emphasis added). One of the agents then requested the Defendant's and passengers' identification forms, and the other extended her hand to the back window to receive them. (*Id.* at 164–65). Only the Defendant moved. (*Id.* at 162, 165). He reached with "jerk[y]," "rigid" movements into the glove box and produced "what appeared to be a temporary driver's license" for himself that was on "printer paper," which "seemed very old" and, at any rate, was not a proper immigration document. (*Id.* at 162, 179, 230). The Border Patrol agents considered the Defendant's behavior suspicious and directed him to pull

---

[1] A later investigation uncovered no narcotics in the vehicle. (Dkt. No. 97 at 251).

2

his vehicle "forward a little" and "to the left" to enter a secondary inspection point. (*Id.* at 165, 167).

Appearing to ignore the agents' instruction, the Defendant drove off and "veered right." (*Id.* at 167–68, 233–34). He approached a low fence where a thick brush line darkened by big trees loomed just a few feet on the other side—an area, according to agents, through which people flagged for further questioning had previously escaped. (*Id.* at 169, 233–34). The Defendant parked "as close to the fence line as he could get." (*Id.* at 170). Alarmed, the agents immediately radioed colleagues who quickly intercepted the Defendant's vehicle. (*Id.*). Within a matter of seconds, the colleagues were able to redirect the Defendant to the secondary inspection point. (*Id.* at 170–71).

Upon arriving at secondary inspection, the Defendant slowed his vehicle to a full stop. (Gov. Ex. 3 at 27:55). An agent approached the driver's window. (*Id.* at 27:59). For the next forty-three seconds, the agent examined the Defendant's temporary driver's license and inquired for documentation from the passengers. (*Id.* at 27:59–28:42). They gave none. (*Id.*). During that time, four other agents casually took "cautious positions" on either side of the vehicle. (Dkt. No. 97 at 236); *see also* (Gov. Ex. 3 at 28:00–28:45).

At some point near the end of his inquiry, the initiating agent determined that the passengers in the back of the vehicle were present in the United States without proper documentation, thus satisfying a predicate for the arrest of the Defendant because he "had assumed responsibility for everyone and declared everyone Cuban." (Dkt. No. 97 at 238). The initiating agent therefore handed the Defendant's temporary license back to him and pulled on the driver's door handle. (Gov. Ex. 3 at 28:42–28:45). It was locked, so he motioned for the Defendant to exit the vehicle. (*Id.* at 28:47).

The Defendant turned off the car's ignition, opened the door, and exited the vehicle. (*Id.* at 28:49–28:58). The agent instructed the Defendant to face the vehicle, and the Defendant complied. (*Id.* at 29:00). But instead of beginning a frisk, the agent grabbed the Defendant's arms to arrest him. (*Id.* at 29:01). Apparently startled, the Defendant quickly whipped his torso toward the agent. (*Id.* at 29:02). After a quick verbal exchange, the Defendant pulled his right hand free from the agent's restraint toward the inside of the vehicle. (*Id.* at 29:06). The agent's reaction was swift: he yanked the Defendant away from the open door and swung him counterclockwise with his right arm flailing until his body slammed against the car's rear panel. (*Id.* at 29:07–29:10). The other agents leapt to his assistance. (*Id.*). Although outnumbered, the Defendant tugged and resisted against multiple agents for the next twenty-eight seconds until one of the agents slammed him to the pavement. (*Id.* at 29:10–29:38). Agents piled on. (*Id.* at 29:40–29:47). For another two minutes, the Defendant demonstrated "super-human strength" by resisting arrest against the collective efforts of four or five agents. (*Id.* at 29:40–31:42); (Dkt. No. 97 at 240). At last, the agents were able to handcuff the Defendant, pull him to his feet, and escort him to a nearby holding cell. (Gov. Ex. 3 at 31:42–32:31).

That's not to suggest that the Defendant was *completely* submissive. Upon being placed in the holding cell, the Defendant "kept yelling." (Dkt. No. 97 at 175–76). A supervisor stepped into the cell and "tr[ied] to calm him down" without effect. (*Id.*) (alterations added). Another agent "attempted several times to read him his rights"—*i.e. Miranda* rights—but his constant yelling made the endeavor momentarily futile. (*Id.* at 176). That agent, knowing her duty "to have [the Defendant] not only hear [his rights] but [also] understand" them, decided to "try later" and instructed the other agents not to speak to him. (*Id.*) (alterations added). "[E]ventually," that agent

4

testified, she was able deliver the Defendant a proper *Miranda* warning, but only "after the fourth or fifth" attempt. (*Id.*).

## 2. The Defendant's Testimony

At trial, the Defendant took the stand in his own defense. (Dkt. No. 98 at 85–124). The thrust of his testimony was to deny any knowledge that the passengers in his car were aliens by asserting that he was merely serving as an informal rideshare driver at the time of his arrest. *See* (*id.*). To do so, the Defendant provided his personal and cultural experiences with the practice of informal ridesharing and then detailed his involvement in transporting the aliens found in his car at the time of his arrest. *See* (*id.*).

The Defendant started by explaining "I'm from Cuba," and "I've been three years in the U.S." (*Id.* at 85). Since arriving, the Defendant had supported his family as a barber in Houston. (*Id.* at 89, 153). Business had been going "very well," that is, until "COVID hit" when his barbershop "went under." (*Id.*). To make a living, then, the Defendant "tried to get into doing Uber or Lyft." (*Id.* at 89–90). He owned an acceptable car and simply needed to renew his driver's license and apply for a position with these rideshare companies. (*Id.* at 90). As his applications with the rideshare companies were pending, however, he started "doing [his] own rides for people" as a type of "unofficial Uber or ride share." (*Id.* at 90, 153) (alterations added). As it turns out, this sort of informal transportation service was not a new concept to the Defendant. During his time in Cuba, the Defendant noticed that "unofficial Uber" was a common way for private citizens who owned cars to make money. (*Id.* at 86). Although he had not owned a vehicle while living in Cuba, he had benefitted from unofficial Uber services as a rider. (*Id.* at 86, 88).

The Defendant testified that the transportation of the aliens found in his car upon arrest began as an opportunity to make extra money from a trusted friend. (*Id.* at 91–92). Specifically, his friend Lazaro—a co-defendant in the case and his wife's former neighbor in Cuba—called him

5

one night and asked him if he wanted to "make a trip." (*Id.* at 91, 122). The job paid $500 and required the Defendant to drive just five hours to "pick up some friends." (*Id.* at 92). In light of his COVID-related unemployment at the time (and with the approval of his wife), the Defendant accepted his friend's offer. (*Id.*). "I thought everything was legal," the Defendant explained. (*Id.*). "If I thought it had been illegal, I wouldn't have done it." (*Id.*).

On the night in question, the Defendant and Lazaro drove to a location in South Texas called "the Valley" to pick up Lazaro's "friends." (*Id.* at 92–93, 119, 163). Per Lazaro's instructions, the Defendant parked his vehicle near a Burger King as Lazaro coordinated through text message with the friends. (*Id.* at 92–93). Soon enough, two people hopped in the car and the Defendant started driving. (*Id.* at 94–96). The group had no conversation about their lives, where they were from, or where they were going. (*Id.* at 95). To the Defendant, "everything seemed normal." (*Id.*). Everyone wore a seatbelt. (*Id.* at 94). The passengers "didn't [appear] nervous at all." (*Id.* at 95) (alterations added). And one of the passengers even fell asleep. (*Id.*). To the Defendant, the situation was "just a typical ride share job." (*Id.*).

Whatever degree of normalcy the Defendant was enjoying during the first part of his trip began fading upon his arrival at the Falfurrias immigration checkpoint. Although the Defendant had been through the checkpoint once before, (*id.* at 97), he was "confused" as to which lane he should enter, (*id.* at 100). He therefore decided to just follow the vehicle ahead of him—a passenger vehicle. (*Id.* at 98, 100–01). As he pulled up to the Border Patrol agents, he kept the music coming from his car's speakers—which he had been playing during the ride thus far to help him "not fall asleep"—at a "pleasant volume." (*Id.* at 97–98). The agents asked for "some form of ID." (*Id.* at 98). Despite having his green card on him at the time, the Defendant opted to supply his temporary driver's license, which was "up-to-date." (*Id.*).

6

When the agents directed the Defendant to go to the secondary checkpoint area, he was once again confused as to where he should go. (*Id.* at 101). He drove slowly, "looking [on] both sides" of the road, and, after seeing some cars parked ahead, decided to park next to them. (*Id.*) An agent approached and told him that this was the wrong area, so he put his vehicle in reverse and followed that agent's directions. (*Id.*).

As he pulled into the secondary checkpoint area, the Defendant was confused and a "bit scared." (*Id.*). Despite the messy events accompanying his arrest, the Defendant testified that he did not "mean to disrespect the Border Patrol agents." (*Id.* at 102). The Defendant simply did not know "that the passengers in [his] vehicle were undocumented." (*Id.* at 127–28). And had he "any idea" that he was getting involved with "something illegal," he wouldn't have gone along with it. (*Id.* at 103).

### B.   CLOSING ARGUMENTS

In its closing argument, the Government's prosecutor was quick to identify for the jury the "picking point" of the entire case: whether "the Defendant knew or recklessly disregarded the fact that . . . those two individuals [in the car at the time of his arrest were] in the United States in violation of the law." (*Id.* at 143) (alteration added). This issue was vital, the prosecutor explained, precisely because the Defendant was "denying knowledge," that is, he was "saying he did not know they were illegal." (*Id.*). "Let me get back to [that]," the prosecutor flagged. (*Id.*).

Upon finishing its review of the charge elements, the prosecutor returned straight to the core issue it had described earlier: whether "Mr. Castillo-Santana knew that they were illegal aliens he was picking up." (*Id.* at 146). The prosecutor enumerated a list of circumstantial evidence allegedly supporting its argument that the Defendant knew his passengers were aliens. (*Id.* at 147–52). This list was largely organized around the narrative of the Defendant's arrival at the Falfurrias immigration checkpoint and highlighted details of the Defendant's behavior the agents (and now

7

the Government at trial) found suspicious. (*Id.*). As the prosecutor reached the part of its narrative where the Defendant arrived at the secondary inspection point—and toward the very end of the prosecutor's closing argument—the prosecutor made the following statement:

> So he's redirected by a bunch of agents and he gets to the secondary and that's when we see the video of what happens there. Instead of saying, "Wait a minute, I'm just a hire[d] driver, I don't know anything about what's going on here," he gets combative with the agents.

(*Id.* at 151) (alteration added). The Defendant did not object. *See* (*Id.* at 151–52). The prosecutor then briefly mentioned the facts that the Defendant was arrested, and the Government collected Lazaro's cell phone from the vehicle. (*Id.*). In conclusion, the prosecutor stated:

> So in the end all of the circumstances point to the fact that Mr. Castillo-Santana knew that those people were illegal aliens. He would have acted much differently had he thought that they were legal. He just would have.

(*Id.* at 152).

In his own closing argument, the Defendant emphasized the informal rideshare alibi, stating in numerous ways that the Defendant was merely working a "side gig as this unofficial type of Uber driver" at the time of his arrest. (*Id.* at 153–54).

Because the Defendant raised no objection to the prosecutor's comment on his pre-*Miranda* silence, this Court had no occasion to provide any cautionary instruction regarding the prosecutor's comment. *See generally* (*id.* at 163–64).

\* \* \*

The next morning, on April 8, 2021, the jury found the Defendant guilty of transporting aliens. (Dkt. No. 99 at 5). On April 22, the Defendant timely filed the instant Motion for a New

8

Trial pursuant to Rule 33.[2] (Dkt. No. 92). The Government responded. (Dkt. No. 93). The Motion is now ripe for review.

## II. DISCUSSION

Rule 33 of the Federal Rules of Criminal Procedure permits federal courts to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Fifth Circuit has explained that "justice so requires" wherever there exists an "error of sufficient magnitude to require reversal on appeal." *Wall*, 389 F.3d at 474. "Although grant or denial of the motion is entrusted to the sound discretion of the judge, motions for new trial are not favored, and are granted only with great caution." *United States v. O'Keefe*, 128 F.3d 885, 898 (5th Cir. 1997). That is to say, a district court should grant a new trial in only "exceptional cases," which include situations involving a "miscarriage of justice." *United States v. Robertson*, 110 F.3d 1113, 1120 n.11 (5th Cir. 1997).

A federal court faced with a motion for new trial based upon a prosecutor's statement at trial must first determine whether the statement was "actually improper." *United States v. Poole*, 735 F.3d 269, 272 (5th Cir. 2013). If the statement was in fact improper, a court must take the further step of discerning whether a defendant's "substantial rights" were affected by the statement, *Wall*, 389 F.3d at 466, 474, considering "the magnitude of the statement's prejudice, the effect of any cautionary instruction, and the strength of the evidence of guilt." *Poole*, 735 F.3d at 273. If no impropriety is found, a court has "no discretion" to order a new trial. *Id.* at 272.

Here, the Parties disagree about whether the prosecutor's comment referencing the Defendant's silence was improper. *See* (Dkt. No. 92 at 2–3) and (Dkt. No. 93 at 5–6). Neither

---

[2] Rule 33 provides in relevant part that "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2).

Party addresses whether the Defendant's substantial rights were affected if the comment is found to be improper. The Court need not engage with that inquiry because, under the circumstances, the comment was not improper.

### A.  WAS THE PROSECUTOR'S COMMENT IMPROPER?

The Fifth Circuit examines the propriety of a prosecutor's comment on a defendant's silence by asking (1) whether the comment violated the defendant's constitutional right to silence, and (2) whether the probative value of the comment outweighs its potential for prejudice. The Defendant argues that the prosecutor's comment was improper for either reason. (Dkt. No. 92 at 2–3). The Court disagrees.

#### 1.  The Constitutional Right to Silence

The first task for the Court in analyzing the Defendant's constitutional right to silence is to distinguish between the provisions of the Constitution implicated by that right. "A prosecutor's invocation of the defendant's exercise of the right to remain silent can potentially implicate two, distinct constitutional rights—due process, and the Fifth Amendment privilege against self-incrimination." *United States v. Salinas*, 480 F.3d 750, 756 (5th Cir. 2007); *see also United States v. Martinez-Larraga*, 517 F.3d 258, 266–67 (5th Cir. 2008) (discussing the distinction). The Defendant appears to conflate these "distinct" rights by quoting directly from the Fifth Amendment's provision for the privilege against self-incrimination but citing a litany of cases wherein courts analyzed a prosecutorial comment as potential Due Process violations. *See* (Dkt. No. 92 at 2) (quoting U.S. Const. amend. V and citing *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (due process); *United States v. Rodriguez*, 43 F.3d 117, 121 (5th Cir. 1995) (same); *Chapman v. United States*, 547 F.2d 1240, 1245 (5th Cir. 1997) (same); *United States. v. Shaw*, 701 F.2d 367, 381 (5th Cir. 1983) (same)). Regardless of which constitutional right the

Defendant meant to invoke, the prosecutor's closing comment on the Defendant's silence violated neither.

          a.        The Privilege Against Self-Incrimination

The prosecutor's comment did not impinge upon the Defendant's privilege against self-incrimination. That privilege derives from the Fifth Amendment, which provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Fifth Circuit has explained that the government does not violate a defendant's privilege against self-incrimination where a prosecutor's comment plainly references that defendant's failure to make a particular "statement[] to the agents," *Martinez-Larraga*, 517 F.3d at 267, or where a defendant takes the stand, *Salinas*, 480 F.3d at 758 n.6.

Here, both circumstances circumscribing the Defendant's privilege are present: the prosecutor's comment unequivocally referenced the Defendant's failure to assert his alibi around the time of his arrest to the agents and the Defendant testified at trial. Accordingly, the Government did not violate the Defendant's privilege against self-incrimination, and the prosecutor's comment was not improper on that basis.

          b.        Due Process

Nor did the prosecutor's comment violate the Defendant's Due Process right. The Supreme Court in *Doyle* held that it would be "fundamentally unfair" and thus a violation of Due Process for a prosecutor to impeach a testifying defendant with his previous failure to disclose an exculpatory story after being apprised of his *Miranda* rights.[3] 426 U.S. at 611, 618–19, 96 S.Ct.

---

[3] Although *Doyle*'s holding directly stemmed from the Fourteenth Amendment's Due Process Clause, 426 U.S. at 619, 96 S. Ct. at 2245, subsequent cases applied *Doyle*'s core holding through the Fifth Amendment. *See, e.g.*, *United States v. Meneses-Davila*, 580 F.2d 888, 890 (5th Cir. 1978) ("While *Doyle* involved a state trial and the due process clause of the Fourteenth Amendment, it is at once obvious that the Court's decision reaches into federal courts with constitutional authority through the Fifth Amendment.").

at 2241, 2245. Since then, the Fifth Circuit has made clear that "the rationale of *Doyle* applies only to post-*Miranda* silence." *Salinas*, 480 F.3d at 757 (citing *Wainwright v. Greenfield*, 474 U.S. 284, 291 n.6, 106 S.Ct. 634, 638 n.6, 88 L.Ed.2d 623 (1986)); *see also Fletcher v. Weir*, 455 U.S. 603, 607, 102 S.Ct. 1309, 1312, 71 L.Ed.2d 490 (1982) ("In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand.").

Here, the prosecutor's closing comment referenced the Defendant's failure to assert his informal rideshare alibi upon arriving at the "secondary" inspection point and around the time he became "combative." (Dkt. No. 98 at 151). The Defendant was not *Mirandized* until he had been taken to a completely different setting well after the scene at the secondary inspection—in a holding cell after the administering agent had made four or five attempts at informing the Defendant of his *Miranda* rights. (Dkt. No. 97 at 176). Notably, the Defendant has made no argument that any *other* governmental action induced his silence at the moment referenced by the prosecutor. *See generally* (Dkt. No. 92). Accordingly, the Government did not violate the Defendant's Due Process right, and the prosecutor's comment was not improper on that basis.

2. **Probative Value Versus Prejudicial Effect**

The Defendant next raises a concern over the "prejudicial effect" of the prosecutor's closing comment referencing his failure to assert an exculpatory story at the time of his arrest. (Dkt. No. 92 at 2). Before *Doyle* set the constitutional baseline for similar circumstances, the Supreme Court utilized a simple balancing test by weighing the prejudicial effect of the government's trial reference to a defendant's silence during arrest against the probative value of such evidence. *See United States v. Hale*, 422 U.S. 171, 176–80, 95 S.Ct. 2133, 2136–38, 45 L.Ed.2d 99 (1975). At the time, the Supreme Court deemed evidence of a defendant's silence at

the moment of arrest to have "little probative force" and to "not [be] very probative of a defendant's credibility." *Id.* at 176, 180, 95 S.Ct. at 2136, 2138. By comparison, the Supreme Court found that such evidence "has a significant potential for prejudice." *Id.* at 180, 95 S.Ct. at 2139.

Although a significant factor supporting the Supreme Court's holding in *Hale* was the fact that the prosecutor there had referenced the defendant's post-*Miranda* silence, *id.* at 177, 95 S.Ct. at 2137, the Fifth Circuit, in a pair of cases, determined that the principles of *Hale* were not as yoked to *Miranda* as they may have appeared. First, in *United States v. Impson*—cited in this case by the Defendant, (Dkt. No. 92 at 2)—a panel applied the *Hale* balancing equation to post-arrest, pre-*Miranda* silence. 531 F.2d 274, 277–78 (5th Cir. 1976). Two years later, in *United States v. Henderson*, the Fifth Circuit extended *Hale* even further, finding that its low regard for a prosecutor's use of a defendant's silence at trial applied even to pre-arrest silence. 565 F.2d 900, 901, 905–06 (5th Cir. 1978).

More recently, however, in *United States v. Musquiz*, the Fifth Circuit significantly reduced the sweep of *Impson* and *Henderson*. 45 F.3d 927, 930 (5th Cir. 1995). Those two cases, the *Musquiz* panel explained, "reflect hostility toward prosecutorial use of a defendant's silence" that "seems to have flourished against the backdrop of an expansive vision of a defendant's rights under the Fifth Amendment, although the opinions do not offer that explanation." *Id.* Further, *Impson* and *Henderson* "refused to recognize the difference between silence before a *Miranda* warning and silence after a defendant has been told that he may remain silent and his silence will not be used against him," thereby "work[ing] an extension of *Miranda*'s bite by giving silence little, if any, probative value and blurring the distinction between silence before and silence after a *Miranda* warning." *Id.* (alteration added). Since *Impson* and *Henderson*, the *Musquiz* panel

13

observed, "the Supreme Court, using the same framework of probative value and prejudice, has recognized that '[s]uch [post-arrest, pre-*Miranda*] silence *is* probative.'" *Id.* (alterations in original) (emphasis added) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 628, 113 S.Ct. 1710, 1716, 123 L.Ed.2d 353 (1993)). "Indeed, the [Supreme] Court has found that pre-*Miranda* silence can be highly probative precisely because it implicates no . . . assurances" that silence would not be used against the suspect. *Id.* (citing *Fletcher*, 455 U.S. at 607, 102 S.Ct. at 1312; *Brecht*, 507 U.S. at 628, 113 S.Ct. at 1716). Therefore, the panel concluded, the manner of weighing probative value and prejudice prescribed in *Impson* and *Henderson* has been "shortened," and those decisions "yield no ruling or holding binding on later panels." *Id.* Rather, those cases are "case specific and fact bound." *Id.* at 930-31.

To reconcile *Impson* and *Henderson* for future courts, the *Musquiz* panel laid down a familiar guiding principle (but decidedly not a "broad rule"): "The admission of evidence that a defendant remained silent on arrest and before a *Miranda* warning turns on fact specific weighing by the trial judge." *Id.* at 931 (citing Fed. R. Evid. 403). The facts in *Musquiz* itself illustrate one such application of this principle that is particularly helpful to this case. There, the appellants (one of whom was an ex-cop) were arrested while standing next to a truck loaded with cocaine. *Id.* at 929. The appellants happened to be dressed as police officers at the time of arrest because, as part of their scheme to steal money from a Colombian crime organization, they intended to act as if they were making a police sting. *Id.* As it turns out, the appellants themselves were the objects of an actual DEA sting—a fake sting within a real sting. *Id.* The appellants were indicted for conspiracy to possess with intent to distribute cocaine. *Id.* At trial, the appellants' central defense was to negate intent: they argued they were present at the scene of arrest only to collect the drugs and turn them over to the proper authorities for an award. *Id.* at 929–30. To protect this defense,

the appellants filed a motion in limine asking the court "to instruct the prosecutor not to question [a testifying defendant] about his silence in the interval between arrest and *Miranda* warnings." *Id.* at 930 (alteration added). After the trial court denied the motion and the testifying defendant nonetheless took the stand to put forth his alibi, the prosecutor cross examined him regarding his failure to offer his story "when he was arrested." *Id.* The jury returned a guilty verdict for both the testifying defendant and his co-conspirator. *Id.* at 929.

On appeal, the appellants argued that the prosecutor's reference to the testifying defendant's silence prejudiced them at trial. *Id.* at 930–31. The Fifth Circuit affirmed the verdict despite the prosecutor's comment. *Id.* at 931, 933. "On these facts," the *Musquiz* panel ruled, "a reasonable juror may have supposed that [the testifying defendant] would have explained when confronted by the police if he was in fact trying to assist the police in catching drug dealers." *Id.* at 931 (alteration added).

On the other side of the spectrum, the facts of *Henderson*—despite the *Musquiz* panel's misgivings with regard to any legal rules drawn therefrom—provide a useful foil to both *Musquiz* and the case at hand. In *Henderson*, a federal prisoner was arrested in a correctional facility after two guards stopped him in a hallway, searched him, and found an envelope of marijuana in his pocket. 565 F.2d at 901. During the entire search—which was witnessed by other inmates—the prisoner remained silent and the guards asked him no questions. *Id.* Only later, after the prisoner had been brought into an interrogation room and expressly waived his *Miranda* rights, did the prisoner disclose his excuse: just moments before his arrest, he had discovered the marijuana envelope in a second floor TV room while performing his assigned janitorial services. *Id.* at 901–02. He further explained to the interrogating officer that he failed to offer this excuse at the time he was searched for a host of reasons: he had not been asked any questions; he had insufficient

15

time to explain himself in the moment; he had not yet decided if he would turn in the contraband because he might not be believed by the prison officials; and he feared for his own safety from other inmates who were watching the search and could have regarded him as a snitch had he disclosed the truth. *Id.* At trial, the prisoner took the stand and provided the same explanation for his failure to disclose his excuse upon being searched, and the testimony of the arresting agent corroborated the prisoner's story. *Id.* at 902. During closing argument, the prosecutor highlighted for the jury the fact that the prisoner "didn't offer any explanation at the time that he was searched." *Id.* The prosecutor also stated to the jury that the prisoner did not answer the prosecutor's questions about his silence when he testified—despite the fact that, in reality, the prosecutor asked the prisoner no such questions. *Id.* at 902 n.1. The jury found the prisoner guilty. *Id.* at 901.

On appeal, the prisoner argued the prosecutor's closing reference to his pre-arrest, pre-*Miranda* silence violated his Fifth Amendment privilege against self-incrimination and right to due process. *Id.* The panel in *Henderson* did not address the constitutional argument, instead finding that the balance between the probative value and prejudicial effect of the prisoner's silence weighed in favor of the prisoner. *Id.* at 905–06. The most important factors with regard to the probative value of the prisoner's silence were that his silence was "consistent with his innocence," and his statements during interrogation and trial testimony were identical. *Id.* at 905. On the other side, the prosecutor's remarks, which were "obvious[ly]" meant to "convey the impression to the jury that he was guilty or else he would not have remained silent when searched" and that "his later explanation was fabricated," were "highly prejudicial." *Id.* (alteration added). This prejudice was "especially" evident "when coupled with [the prosecutor's false] statement that [the prisoner] did not answer his questions about his silence." *Id.* (alterations added). Under these circumstances, the *Henderson* panel found, "the comments were improper." *Id.* at 906.

16

The facts of the instant case are much closer to *Musquiz* than *Henderson*. Here, as in *Musquiz*, the Defendant's excuse at trial was meant to undermine his *mens rea* for the indicted conduct. In both cases, the excuses contained at least a kernel of believability, and thus would reasonably spark curiosity over why the Defendant did not explain his transportation of aliens "when confronted" by the agents. *See Musquiz*, 45 F.3d at 931. But both in *Musquiz* and this case, that curiosity went unsatisfied. By comparison, the prisoner in *Henderson*, whose alibi appeared similarly believable, provided a full-throated explanation for his silence—an explanation that he disclosed upon being interrogated, that he repeated verbatim at trial, and that the arresting officer corroborated. Moreover, the *Henderson* prisoner's explanation for his silence made sense, especially in light of the prisoner's uncertainty about how to dispose of the marijuana and fear of retribution from onlooking prisoners. These facts regarding the prisoner's explanation of his silence in *Henderson* set that case apart in an important way from the facts in *Musquiz* and the instant case, where the juries entered their deliberations burdened with a reasonable question as to why those explanations were not promptly given upon arrest. Thus, as in *Musquiz*, the probative value of the Defendant's unexplained pre-*Miranda* silence remains high. *See Brecht*, 507 U.S. at 628, 113 S.Ct. at 1716. On the other side of the balance, the prejudicial impact of the prosecutor's transitory comment here is unmistakably slighter than the misleading comment in *Henderson*. On the facts of this case, then, the probative value of the prosecutor's comment on the Defendant's silence outweighs any prejudicial impact flowing therefrom. Therefore, the comment was not improper.

## III. CONCLUSION

For the foregoing reasons, the Court concludes that the prosecutor's reference to the Defendant's silence at the time of arrest during its closing argument caused no miscarriage of justice. The Court therefore **DENIES** the Defendant's Motion for New Trial.

It is SO ORDERED.

Signed on June 29, 2021.

                                          _____
                                          **DREW B. TIPTON**
                                          **UNITED STATES DISTRICT JUDGE**